It is my opinion that the plaintiff is entitled to recover the $1,000 under the double indemnity provisions of the policy for two reasons: (1) that the exclusionary clause relied upon by the insurance company is too vague and ambiguous to be invoked, in that it does not with certainty and precision point out just what are to be considered acts incidental to war, and (2) that Bologna's death resulted not "directly or indirectly from war or any act incident thereto," but from an incident of a peril of navigation which is prevalent in times of peace as well as in times of war.
I concede that a war risk exclusion is not against public policy, and that such provision will be enforced, for it is a part of the contract between the parties. But when one buys a policy of insurance, and an exclusion from coverage is stipulated in the policy, the exclusion must be couched in crystal-clear language that will inform a reasonable person exactly under what circumstances the insurer is to be absolved from liability in the event of the maturity policy. No "catch-all" exclusion clause such as the one we have considered should be applied to such facts as we find involved here. My colleagues are of the opinion that an insurer who attempts to include all possible situations might overlook one or more, which circumstance might militate against a successful defense by the insurer in certain cases. They say that it is safer for the insurer to word the exclusion in general terms, and to leave it to the courts to determine whether the facts of any given case are within the contemplation of the limitation of the insurer's liability. My answer to that is that when one buys life coverage, he does so for the protection of his beneficiary, and is well within his rights in relying on that protection being there when the policy becomes payable. He does not contemplate buying a lawsuit, and is entitled to know exactly in what particulars and under what circumstances and facts the insurer is to escape liability under the exclusion from coverage clause. My thought is that an insurer must spell out the exclusion.
It is a cardinal rule in construing insurance policies that all ambiguities are to be resolved most strongly against the insurance company. No citation of authority on that point is necessary. *Page 58 
I doubt very much if, at the time the policy was issued (June, 1936, long before the outbreak of the war), the author of the clause had in mind that the death of a merchant seaman resulting from an unexplained collision between merchant ships was intended to be included in the provisions limiting the liability of the insurance company.
I doubt most seriously that the author of the clause intended that the word "war" would have any meaning other than the popular conception of the word, that is, open combat with an enemy on land, sea, or in the air, or actual contact with the enemy. And assuming that the insured, Bologna, was a reasonable person, it cannot be doubted that he had no other conception of the meaning of the word "war."
My colleagues believe that the word "war" is to be construed in a broad and technical sense, rather than in its ordinary sense. With this I cannot agree. I can only say that the phraseology of insurance contracts is that chosen by the insurer, and the contract, in a prepared and fixed form, is tendered to the prospective policyholder, who is often without technical training and who rarely accepts the policy with a technician at his elbow.
Frankly, I do not comprehend exactly what the insurer intended to exclude from policy protection. Are the words "incident of war" to embrace incidents which are remotely connected with armed hostilities? If so, how remotely connected? I could recite many hypothetical cases which would be extreme to say the least, but if the arguments of the defendant are to prevail, almost every accidental death occurring during a period of war could be somehow traceable to the war, and be deemed incidental to war.
If the insurance company had intended that a death occurring under circumstances prevalent in the instant case was to be without the policy range of protection, it would have been simple enough for the defendant to have added to the limitation clause "or any act incident to perils of the sea during war."
I would be unwilling to place a construction on the vague and ambiguous limitation of liability clause so as to have it encompass a case such as the instant one.
It must be borne in mind that Bologna was not engaged with the armed forces, but was a member of the United States Maritime Service, serving as Assistant Purser on a merchant ship. He maintained his civilian status, for it is true that seamen in the Maritime Service have never been classified as other than civilians.
From the birth of navigation, when man discovered that a fallen tree would bear his weight downstream and that by the use of a pole or rough paddle he could check, accelerate, and direct its course, catastrophes on the water have been all too common.
The stipulation of facts recites that both vessels had the usual complement of armed guards and guns, with ammunition for servicing said armament — which can be said to be true also of most any vessel that plied the seas during the late war — but nonetheless, by carrying such armament, and perhaps having an armed escort, the vessels cannot be taken out of the category of merchant ships. The armed guards and the fore and aft guns were installed on the vessels involved herein, and upon other ships flying the American flag, as a means of repelling attacks by submarines, airplanes, and other hostile craft. The armed guards, the guns and ammunition, and the armed escort had nothing whatever to do with Bologna's accidental death.
The prevailing opinion recites that both vessels were loaded with war materials. It may be said that during war practically all cargo can be classified as war cargo. This would even extend down to vehicles loaded with materials carried to and from war plants and shipyards by the humble ferries plying the Mississippi River. If the argument of the defendant is to prevail, any insured who was a member of the crew of most any kind of water craft could be considered engaged in the war, and his activities would bar recovery of the double indemnity benefits under the exclusionary provisions of the policy contract.
The stipulation of facts recites that the vessels were travelling in convoy on a *Page 59 
foggy night without signals or intership communication, but nevertheless, in my opinion, the "SS J. Pinckney Henderson" was not engaged in a warlike operation. In the case of Nordling v. Gibbon et al., D.C., 62 F. Supp. 932, the court was concerned with the death of a merchant seaman who was insured under a policy providing for payment for loss of life and bodily injury "occasioned by capture, seizure, destruction by men of war, piracy, takings at sea, arrest, restraints and detainments and other warlike operations * * *." The insured was a member of the crew of a vessel sailing from Cuba bound for Baltimore, carrying a cargo of molasses to a distillery at Baltimore to be used to manufacture alcohol which in turn was to be used in the manufacture of powder and other war materials. The ship proceeded under orders of the Navy Department completely blacked-out, and collided with another vessel which was also travelling under black-out conditions by order of the Navy Department. The ship of whose crew the insured was a member sank, and the insured died. The court was of the opinion that the question involved was whether death was occasioned by "other warlike operations", and in resolving the question held that the collision did not result from warlike operations.
In Yorkshire Dale Steamship Co., Ltd., v. Ministry of War, Transport, Times Law Reports, June 5, 1942, Vol. LVIII, p. 263, Lord Porter said, at page 269: "* * * (III) in the case of a ship proceeding on a voyage which is not in itself a war-like operation, absence of lights, sailing in convoy, and zigzagging are not separately or in combination a war-like operation, nor indeed is it a war-like operation to follow the course set by the naval officer in charge of the convoy * * *"
On Page 267, Lord Wright commented: "* * * Lord Dunedin summed up the position briefly. After observing that the Matiana case (supra) was a clear decision that the escorting vessel of a convoy was engaged in a war-like operation while the escorted vessel was not * * *"
To quote further from the case, the Lord Chancellor stated, on page 264: "* * * It is for this reason that sailing without lights, or sailing in convoy, are regarded as circumstances which do not in themselves convert marine risks into war risks * *"
While there are several cases wherein the construction of "results" clauses identical with or similar to those relied upon by the present insurer were involved, an examination will show that not one contains facts analogous to those of the instant case.
In Eggena v. New York Life Ins. Co., 236 Iowa 262,18 N.W.2d 530, 533, the insured, a member of the United States Army, was fatally injured when the tank in which he was training fell from a bridge during routine army maneuvers. The court held that military personnel must be trained in the actual field work which will be encountered later in combat, and that a soldier's training should be considered an essential and integral part of prosecuting a war. The court said: "It was not a hazard of normal life but a hazard of one who was engaged in military service only."
In Hooker v. New York Life Ins. Co., 161 F.2d 852, 857, decided by the United States Circuit Court of Appeals for the Seventh Circuit, with one judge dissenting, the insured was a captain in the United States Marine Corps and met an accidental death in New Zealand while engaged in war training maneuvers. The court said: "The circumstances surrounding the unfortunate accident which befell insured point unerringly to the conclusion that he was engaged in 'an act incident to war.' The total objective of his military service was to prepare himself and those under his command to aid his country in winning the war. Solely for the accomplishment of this objective he and those under his command were stationed in New Zealand, a place designated for their training. They were engaged in an activity under military command as one of the necessary steps in the conduct of the war. The insured was in New Zealand because of war and his activities were because of war and a part of war.The activities in which he was engaged and which resulted inhis death were in no wise common to a civilian. * * *" (Italics mine.)
In Vanderbilt v. Travelers Ins. Co., 235 N.Y. 514,139 N.E. 715, the insured, *Page 60 
a civilian, was a passenger on the British Steamer "Lusitania" and was drowned when the ship was sunk by a torpedo launched from a German submarine. It will be noted that the death resulted from the action of a belligerent enemy, and the court properly held that the sinking of the vessel resulted from an act of war within the contemplation of the clause limiting policy protection, and exonerated the defendant company.
In Coxe v. Employers' Liab. Assur. Corp., 2 K.B. 926, the policyholder was a captain in the British Army on active duty patroling outposts along a railroad track, and during a black-out was struck by a locomotive and killed. The court held, and I believe properly so, that the death, which occurred while the insured was performing military duties, was an incident of war.
I cannot refrain from making this observation here: If Captain Hooker had been a civilian and a member of the train's crew, and had been killed through the train colliding with another, then I would say that the facts were analogous to those in the Bologna case, and if the court had been confronted with those facts, I am not at all sure that the insurer would have been absolved under the exclusionary clauses contained in the policy.
In Stankus v. New York Life Ins. Co., 312 Mass. 366,44 N.E.2d 687, 688, the insured was a member of the Navy and a crewman of the "USS Reuben Jones," a naval vessel which was torpedoed by an enemy submarine, resulting in his death. Here again we find a case where the exclusionary clauses were undoubtedly applied only because death resulted during military service and from enemy action.
In Smith v. New York Life Ins. Co., Ohio Com.Pl. 1948, 86 N.E.2d 340, the insured was a civilian worker in a plant manufacturing bombs to be used by the military. The case was decided by the Court of Common Pleas for Franklin County, Ohio, which is a trial court, and I heartily disagree with the conclusion reached by the judge, believing his opinion to be exceedingly farfetched. A research fails to reveal whether an appeal from the judgment was prosecuted.
Railey v. United Life and Accident Ins. Co., 26 Ga. App. 269, 106 S.E. 203, involved a soldier who was killed when the ship on which he was being transported to Europe to take part in the First World War collided with another vessel. Here again we have the military aspect. The insured was killed while engaged in military duty.
In Selenack v. Prudential Ins. Co., 160 Pa. Super. 242,50 A.2d 736, the military status of the insured is prominent. He was killed during army training in this country while riding in the turret of a tank.
In Thompson, Sr., v. New York Life Ins. Co., Com.Pl. S.C., 13 Life Cases 235, liability was limited to the premiums paid if death resulted from an act of war or any act incident to war while the insured was in the military service of any country engaged in war, or if death resulted from operating or riding in any kind of aircraft, whether as a passenger or otherwise. The insured, who was a navigator attached to a troop carrier command in the Pacific Area, left Okinawa by plane bound for Iwo Jima on a troop ferrying mission. The plane reported by radio from the vicinity of the Bonin Islands, but was not thereafter heard from and no trace of it was ever found. Under the peculiar provisions of the exclusionary clauses, and under the facts of the case, there is no doubt that the court correctly held that the insured died in the performance of military duties which were incidental to the prosecution of the war.
In Clarke v. New York Life Ins. Co., 13 Life Cases 239, decided by the Court of Common pleas, Sumpter County, S.C., the limitation clauses were similar to those involved in the Thompson case. Clarke was assigned to an administrative post in army aviation, but was accidentally killed while riding in an airplane on active duty. In addition to applying the war risk clause, the court also found that recovery on the policy was barred by virtue of prohibited "aviation activities."
Thus, it will be seen that in each of those cases which were persuasive to my colleagues, except the Smith and the Vanderbilt cases, the insured was killed while performing duties which were only performed by those in the armed service. In the Vanderbilt case, although the insured *Page 61 
was a civilian, he came to his death as the result of an act of war perpetrated by an enemy of the country whose flag was flown by the "Lusitania." The Smith case, involving a worker in a munitions plant, does not impress me in the least.
Even assuming that the exclusionary clause in Bologna's policy is free from ambiguity, my opinion is that it can avail the defendant nothing, and that the insurance company is liable for double indemnity. The manner of the insured's death was such as was likely to happen to a civilian as well as to one engaged in military service. The courts made that point in at least two of the cases cited in the majority opinion. In the Hooker case it was said: "The activities in which he was engaged and which resulted in his death were in no wise common to a civilian."
And in the Eggena case we find: "Here the deceased came to his death riding in an army tank as a member of a crew in training for war, which is not a cause of death common to civilian life."
Bologna was not in any manner engaged in war within the context and contemplation of the disputed clause. He was pursuing his duties as a merchant seaman while attached to a merchant vessel not engaged in hostilities, and his death was an incident of a peril of navigation and not directly or indirectly as a result of war. The chain of causation is: the collision of the ships, the resulting fire on the "Henderson," followed by Bologna's leap into the flaming sea. What caused the vessels to collide is not shown by the record, and it may be that the accident occurred through faulty steering apparatus on one or both of the vessels involved, or from negligence or misunderstood signals, all of which things constitute what might properly be classified as marine perils, and any one of which might cause ships to collide in broad daylight during times of the most tranquil peace and under the most ideal sailing conditions.
The incident of war factor, in my mind, does not enter the case, and I cannot lead myself to the belief that Bologna's death was an incident of war. I quite agree with what Judge Dawkins, of the United States District Court, said in Savage v. Sun Life Assur. Co. of Canada, 57 F. Supp. 620, 621, wherein was involved a policy which excluded double indemnity for death resulting from war or any act incident thereto: "The phrase 'incident thereto' would seem to contemplate an incident such as the striking of an enemy mine, or the loss of life in the act of taking off or landing of a military plane from an aircraft carrier, etc."
My opinion is that the judgment appealed from should be reversed, and that plaintiff should recover.
I respectfully dissent.